## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### TAMPA DIVISION

**DIANE WILLIAMS,**

     **Plaintiff,**

**v.**                               **Case No.  8:04-cv-2298-T-30EAJ**

**HUNTINGTON BANCSHARES, INC. d/b/a**
**THE HUNTINGTON NATIONAL BANK,,**

     **Defendant.**

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment and Supporting Memorandum (Dkt. #29), the Deposition of Diane Williams (Dkt. #28), and the Response in Opposition to Motion for Summary Judgment (Dkt. #31). The Court, having considered the motion, deposition, affidavits, exhibits, response, memoranda, and being otherwise advised in the premises, finds that Defendant's motion should be granted.

### Procedural Background

On February 13, 2002, Plaintiff, Diane Williams (an African-American female), filed a Charge of Discrimination with the EEOC and the St. Petersburg Community Affairs Department, Human Relations Division, asserting race discrimination and retaliation. Subsequently, on October 19, 2004, Plaintiff filed the Complaint in this case, alleging violations of Title VII, 42 U.S.C. § 2000e-2(a) et seq., as amended; 42 U.S.C. § 1981, et seq.;

and the Florida Civil Rights Act, Florida Statutes Chapter 760.  On April 14, 2006, Defendant filed a Motion for Summary Judgment arguing that Plaintiff has failed to establish a prima facie case of race discrimination.  On May 10, 2006, Plaintiff filed a response in opposition to Defendant's summary judgment motion arguing that Defendant maintained a pattern and practice of discrimination and retaliation by showing preferential treatment to a white part-time employee (Erica Craig) by allowing Craig to receive a Life Insurance and Annuity License while employed as a Customer Service Representative/Teller ("CSR").

### Undisputed Facts Offered by Plaintiff During Plaintiff's Deposition

In 1998, Plaintiff became an employee of Huntington National Bank ("HNB"), when HNB acquired the Coquina Key branch at which Plaintiff was already working as a part-time Personal Banker.  Plaintiff worked part-time for HNB from June 1998 to February 15, 2002, when HNB's Florida assets were purchased by SunTrust Bank.

Plaintiff held two different positions during her time with HNB.  She started as a part-time Personal Banker, and eventually she became a part-time CSR.  Both Personal Bankers and CSRs are paid an hourly rate.

Personal Bankers open checking and savings accounts and establish IRAs, certificates of deposit, and other banking products.  Personal Bankers may also have the opportunity to obtain Life Insurance and Annuity ("LIA") licences.  Licensed Personal Bankers are permitted to sell non-banking products, including insurance policies.  Personal Bankers may receive commission incentives for selling insurance products.  CSRs take customer deposits, cash checks, make money orders, and perform similar duties from the teller line.

Historically, CSRs do not typically have LIA licenses and are not permitted by law to receive commission incentives for selling insurance products. However, CSRs may receive referral incentive payments in the amount of $5.00 per referral, to encourage CSRs to market products for the bank.

After working with HNB as a part-time Personal Banker for about six months, Plaintiff's supervisor at HNB appointed Plaintiff to get her LIA license. Plaintiff obtained her LIA license in March of 1999. According to Plaintiff, the process of getting an LIA license included: appointment by the branch, filing out an application, a two week training class, studying and taking a test given by the state. Plaintiff acknowledges that HNB paid for the mandatory application fee, training classes and other related costs.

It is undisputed that Plaintiff had a good employment record as a Personal Banker and was well liked by her clients and supervisors. In Plaintiff's deposition, Plaintiff states on numerous occasions that she only wanted to work part-time. Plaintiff works part-time because it is convenient and comfortable for her. Plaintiff prefers to work part-time in order to accommodate her lifestyle.

In the Spring of 1999, Roy Binger (an African-American male) was HNB's Regional Manager with oversight over Plaintiff's branch. Plaintiff has testified that on numerous occasions, Mr. Binger would ask Plaintiff whether she was ready to change from a part-time Personal Banker to a full-time Personal Banker. Plaintiff has testified that she always rejected the idea of going full-time. Plaintiff found Mr. Binger's numerous requests to go full-time "annoying" because she was content with her part-time schedule.

In May of 1999, two of the local branches were restructured and Plaintiff was moved to a part-time Personal Banker position at the Central Plaza branch.  Plaintiff acknowledges that her transfer to Central Plaza was a lateral transfer and that she was content with the transfer.  Plaintiff admits in her deposition that she has no reason to believe that the transfer to the Central Plaza branch was based on her race.  However, Plaintiff asserted that she thought the transfer was based on her gender and her seniority[1].  Plaintiff's immediate supervisor at the Central Plaza branch was Brenda Williams, an African-American female.

In October of 1999, Mr. Binger again asked Plaintiff if she would be willing to change from part-time status to full-time status at the Central Plaza branch.  Mr. Binger told Plaintiff that Central Plaza needed another full-time Personal Banker.  Plaintiff considered the full-time job offer overnight, but the next day told Mr. Binger that she wanted to remain working on a part-time basis.  Mr. Binger told Plaintiff that if she did not want to accept the full-time Personal Banker position that he would have to find someone else.  Mr. Binger then told Plaintiff that her current part-time position as a Personal Banker was being converted to a full-time position, and that if she wished to remain working as a part-time employee only, the only part-time position available would be in a CSR position in the same branch.  Once

---

[1] The Court notes that Plaintiff has not brought a claim based on gender or age discrimination.  Additionally, Plaintiff basis her claim that she was discriminated against because of her "seniority," on the fact that she had accrued 120 days of sick leave as a part-time employee and "inherited other great benefits, such as: retirement, 401k, hospitalization, dental, supplemental life insurance, life insurance, short-term disability, long-term disability, sick time, four weeks vacation time.  Plaintiff states in her deposition, "As a matter of fact, Huntington had one of the best incentive programs that I have ever experienced at any of the banks I had ever worked at." Plaintiff's Deposition, Dkt. 28-2, Page 16, Lines 22-25.

again, Plaintiff rejected the full-time position and told Mr. Binger that she wanted to remain a part-time employee.

A few weeks later, Plaintiff was transferred to a part-time CSR position.  Mr. Binger allowed Plaintiff to retain her same pay rate and all other accrued employee benefits. Plaintiff did not initially complain about her transfer to the CSR position.

In her deposition, Plaintiff states that she feels Mr. Binger "retaliated" against her by transferring her to the CSR position, because Mr. Binger seemed to have been personally offended that she had refused to go full-time.

After a few months working as a CSR, Plaintiff became discontent as a CSR, because she could not use her LIA license or receive commission incentives for selling insurance products.  Instead, Plaintiff could only receive referral incentive payments in the amount of $5.00 per referral for referring a client to a Personal Banker for insurance products.  Plaintiff acknowledges that HNB's banking policies and procedures did not allow CSRs to receive commissions for selling insurance products.  Accordingly, Plaintiff told her managers that she wanted her old job as a part-time Personal Banker back.[2]  She felt that she had been demoted to a CSR.  Plaintiff was told that her part-time position no longer existed and they wanted to fill the open Personal Banker position with a full-time employee.  Plaintiff testified that there was more than one open full-time Personal Banker position, so she felt that it would have been better for the bank to hire her as a part-time Personal Banker rather than

---

[2] In the alternative, Plaintiff asked her manager to create a new part-time "floater" position, so that she could work both on the teller line as a CSR and at the desk as a Personal Banker.  She was not permitted to do this.  No one else was permitted to do this either.

have an unfilled full-time position.  Apparently, Mr. Binger attempted to fill the new full-time position several times by hiring up to six full-time Personal Bankers, but no one hired for the full-time position lasted very long in the position.

In March of 2001, Plaintiff's LIA license, which she had obtained in March of 1999 while working as a Personal Banker, was due to expire.  Plaintiff admits that she received a letter from the State of Florida in October of 2000 indicating that her license would need to be renewed.  Plaintiff stated in her deposition that "it wouldn't be beneficial staying at the teller line with a license that the bank is not permitting me to use."  At this point in time, Plaintiff still had no desire to be a full-time Personal Banker.  However, Plaintiff admits that she never asked the bank whether it would be willing to pay the renewal fee to have her LIA license renewed.  Plaintiff admits, "No one told me that I couldn't renew them.  Although, you know, if you're not utilizing your license in a position you can't use them – I would have loved to have been able to use my license had I been promoted back to personal banking so I could use the license, but, no."  When asked in her deposition whether she requested that anybody in the bank appoint her for renewal of her LIA license, Plaintiff stated, "No.  I just requested a promotion."

On May 11, 2001, Plaintiff filed a written complaint with Lee Weatherford, the new regional manager, who replaced Mr. Binger, complaining that despite her repeated requests, she still had not been reassigned to a part-time Personal Banker position.  Plaintiff felt that she was being subjected to "workplace discrimination."  Mr. Weatherford, met with her and discussed her concerns, but did not offer to create a part-time Personal Banker position.

In the last quarter of 2001, SunTrust confirmed that it was purchasing HNB's Florida assets. As part of the transition, SunTrust announced that Personal Bankers would no longer be selling LIA products. Apparently during the last quarter of 2001, another HNB employee (not Plaintiff) complained to management that it was unfair that Erica Craig (another part-time CSR) was given the opportunity to obtain a LIA license[3], when the other CSRs were not. Subsequently, at a meeting with all CSRs, including Plaintiff, the then current manager, Linda Baker, told the CSRs that Baker had received permission from Lee Weatherford to appoint all of the CSRs/tellers so they could all sell life insurance and annuities on their teller line. After the meeting was over, Baker dropped off an application at Plaintiff's teller station. Baker told Plaintiff that Baker was authorized to have the tellers go to school to receive their licenses to broker the products on the teller line. However, Plaintiff has stated that Baker did not provide as much detailed information regarding the application process to the CSRs as she provided to Erica Craig. Plaintiff admits that she did not fill out the application or pursue a LIA license at that time.

## I.      Plaintiff's Allegations.

In Plaintiff's Complaint, she alleges that HNB discriminated against her because of her race. Plaintiff claims that she was demoted from a Personal Banker position to a CSR position. As a result of such demotion, Plaintiff was prevented from retaining or using her

---

[3] Erica Craig obtained her LIA license in June or July of 2001.

license while she held the CSR position, which further prevented her from the opportunity to collect monetary "incentives."  Plaintiff further claims that another white CSR was allowed to obtain and use a LIA license while at HNB.  Plaintiff claims that as a result of HNB's preferential treatment of Erica Craig, Plaintiff was subjected to ongoing discrimination due to her race in violation of Title VII, and the FCRA.  In Plaintiff's complaint, she alleges that HNB, though its supervisors and managers, discriminated against her based on her race and engaged in a pattern and practice of discrimination.  Plaintiff further claims that HNB failed to exercise reasonable care to promptly prevent and correct the discrimination.

## II.    Defendant's Argument.

In support of Defendant's motion for summary judgment, Defendant simply offers the Plaintiff's deposition transcript, a two page Affidavit submitted by HNB's Senior Vice President of the Human Resources Division, and a copy of Defendant's Request for Admissions to Plaintiff.[4]  In short, Defendant argues that Plaintiff has failed to state a prima facie case of race discrimination.

## III.    Motion for Summary Judgment Standard.

---

[4] Defendant asserts that Plaintiff did not respond to Defendant's Request for Admissions; and therefore, such admission should be deemed admitted.  Plaintiff, however, has attached a copy of her proposed response to Defendant's Request for Admissions.  Plaintiff's response appears to be dated October 23, 2005, which would constitute a timely response.  Since there appears to be a dispute about whether the Requests for Admissions were answered in a timely manner, for the purposes of this motion, the Court will consider Plaintiff's response as timely.

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  Id.  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor.  Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.   The evidence must be significantly probative to support the claims.  Anderson,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983).  A dispute about

a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a conflict in substantial evidence to pose a jury question.  Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

IV.   **Discussion.**

A.      **Plaintiff has offered no direct evidence of race discrimination in violation of Title VII.**

A prima facie case of race discrimination under Title VII of the Civil Rights Act of 1964 can be proven by direct evidence of discriminatory intent or circumstantial evidence via the four-prong test set out in McDonnell-Douglas Co. v. Green, 411 U.S. 792 (1973). Direct evidence is evidence that, if believed, proves the existence of a fact in issue without inference or presumption.  See Mora v. University of Miami, 15 F. Supp.2d 1324, 1332 (S.D. Fla. 1998), aff'd, 189 F.3d 485 (11th Cir. 1999).  If the evidence presented is subject to more than one possible meaning, it is not direct evidence.  See Mora, 15 F.Supp.2d at 1333.

In Plaintiff's deposition, Plaintiff admits that she does not have evidence that her transfer from a part-time Personal Banker at Coquina Key to a part-time Personal Banker position at Central Plaza was because of her race.  See Plaintiff's Deposition, Page 65, Lines 1-14.  Rather, it appears that Plaintiff feels that she was transferred because of her gender (female) and her seniority.  Plaintiff admits, however, that her transfer from Coquina Key to Central Plaza was a lateral transfer.

Further, Plaintiff offers no direct evidence that her transfer from a part-time Personal Banker at Central Plaza to a part-time CSR at Central Plaza was because of her race. Plaintiff only asserts that the transfer was the result of "immediate retaliation" on the part of Mr. Binger (African-American male), because she refused to accept a full-time position as a Personal Banker.

Accordingly, Plaintiff has failed to offer direct evidence of race discrimination.

**B.      Plaintiff has failed to establish a prima facie case of discrimination.**

To prove race discrimination through circumstantial evidence, Plaintiff has the initial burden of demonstrating a prima facie case of race discrimination with record evidence. See Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001). Only after the plaintiff meets her burden of persuasion does the burden shift to the defendant to articulate a legitimate, non-discriminatory business reason for the employment action at issue. See id. Once the defendant articulates a legitimate, nondiscriminatory business reason for the employment action at issue, the burden returns to the plaintiff to demonstrate that each proffered reason is a pretext for race discrimination. See id.

To survive summary judgment, Plaintiff must establish a prima facie case of race discrimination with record evidence that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) the employer treated similarly-situated employees outside her protected class more favorably. See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306 (11th Cir. 1998); Chambers v. Walt Disney World Co., 132 F.Supp.2d 1356 (M.D. Fla. 2001).

### 1. Plaintiff is a member of a protected class.

It is undisputed that Plaintiff is African-American; and therefore, Plaintiff satisfies the first prong of her prima facie case.

### 2. Plaintiff has not established that she was qualified for the position at issue.

It is undisputed that Plaintiff was a good employee with years of experience as personal Banker. Plaintiff has asserted many times that she wanted her "old job back" as a part-time Personal Banker. However, her previous part-time Personal Banker position was eliminated. Instead a full-time Personal Banker position was created by HNB in order to serve the needs of HNB's banking clients. One of the requirements of the full-time Personal Banker position was that an employee would have to work forty (40) hours a week. Plaintiff obviously was not willing to fulfill such responsibility. Thus, she was not qualified for the position at issue.

The full-time Personal Banker position was offered to Plaintiff on numerous occasions. Plaintiff rejected the offer to accept the full-time Personal Banker position on numerous occasions. This was Plaintiff's choice. In the alternative, Plaintiff was offered a position as a part-time CSR. It appears that Plaintiff chose to accept the position as a part-time CSR, so that she could remain working on a part-time basis. Once again, this was Plaintiff's choice. Plaintiff was not involuntarily demoted or transferred against her will.

### 3. Plaintiff has not established that she was subjected to an adverse employment action.

Plaintiff has failed to offer any evidence showing that she was subjected to an adverse employment action based on her race.

### a.      Plaintiff's acceptance of the part-time CSR position.

The full-time Personal Banker position was offered to Plaintiff on numerous occasions.  Plaintiff rejected the offer to accept the full-time Personal Banker position on numerous occasions.  This was Plaintiff's choice.  In the alternative, Plaintiff was offered a position as a part-time CSR.  It appears that Plaintiff chose to accept the position as a part-time CSR, so that she could remain working on a part-time basis.  Once again, this was Plaintiff's choice.  Plaintiff was not involuntarily demoted or transferred against her will. Plaintiff received the same hourly pay rate as she did as a Personal Banker.  Further, Plaintiff retained all of her accrued benefits.  Thus, Plaintiff's acceptance of the part-time CSR position fails to establish that she was subjected to an adverse employment action.

### b.      Plaintiff's inability to use her LIA license while working as a CSR.

Plaintiff worked at HNB as a part-time CSR from January 2000 through February 15, 2002.  Up until the last quarter of 2001, (when SunTrust confirmed that it was purchasing HNB's Florida assets), HNB's banking policies and procedures did not allow CSRs to "sell" certain non-banking products, such as insurance and annuity products.  CSRs could only "refer" clients to purchase such products from a Personal Banker.  CSRs would receive a $5.00 referral fee per referral whether the client purchased a product or not.  If a Personal Banker actually closed a sale of a non-banking product, the Personal Banker would receive

a commission incentive.   It appears from the record that Plaintiff was aware of this distinction before she accepted the part-time CSR position.  Accordingly, Plaintiff's inability to use her LIA licence while working as a CSR fails to establish that she was subjected to an adverse employment action.

**4.     Plaintiff has not established that a similarly-situated employee outside of her protected class was treated more favorably.**

**a.     Matt Waters is not a similarly situated employee.**

The record is clear that Matthew Waters was a full-time Personal Banker in the Central Plaza branch from February 2001 to June 2001.  For a period of time, Matthew Waters split his time between two branches, but he was at all times a full-time employee of HNB.  Thus, Matthew Waters is not a similarly situated employee.

**b.     Erica Craig was not treated more favorably.**

In Plaintiff's Complaint, Plaintiff claims that Erica Craig, a white female, also working as a part-time CSR was given preferential treatment.  However, from a review of the record, it appears that Erica Craig was not treated any more favorably than Plaintiff.  Specifically, Plaintiff claims that Erica Craig was treated more favorably because HNB allowed Erica Craig to obtain a LIA license in July of 2001.

Plaintiff's claim that Erica Craig received preferential treatment is without merit.  Plaintiff received the same "preferential treatment" in March of 1999.   Plaintiff acknowledges that HNB allowed Plaintiff to obtain her LIA license in March of 1999.  Plaintiff chose to allow her LIA license to expire in March of 2001.  Furthermore, Plaintiff

has offered no evidence showing that Erica Craig was promoted in front of Plaintiff, or that Craig was hired to fill a position that Plaintiff desired. The record is clear that both Plaintiff and Craig were co-employees, maintaining the same position as CSRs for HNB at the Central Plaza branch.

It appears that there was some confusion in the last quarter of 2001 at which time SunTrust announced that Personal Bankers would no longer be selling LIA products. Soon after, HNB manager, Linda Baker, told all of the CSRs (including Plaintiff) that Baker received permission from upper management to appoint all of the CSRs/tellers so they could all sell life insurance and annuities on their teller line. After the meeting was over, Baker dropped off an LIA application at Plaintiff's teller station. Baker told Plaintiff that Baker was authorized to have the tellers go to school to receive their licenses to broker the products on the teller line. This announcement was made after the expiration of Plaintiff's initial LIA license (March 2001) that she had received with HNB's support in March of 1999.

Plaintiff readily admits that HNB helped her obtain a LIA license in March of 1999. Plaintiff admits that she did not request HNB to approve and pay for the renewal of her LIA. Rather, Plaintiff simply requested that she be given her old job back so she could use her license. When Plaintiff was not given her "old job back" as a part-time Personal Banker position, Plaintiff admits that she decided that there was no reason to renew her LIA license. Furthermore, Plaintiff admits that she did not fill out the application or pursue a renewal of her LIA license in the winter of 2001 or the spring of 2002, even after being encouraged to do so by HNB managers.

Plaintiff argues in her Response to Defendant's Motion for Summary Judgment that she could not have renewed her license, because applicants are required "to swear and affirm that you have worked and have experience as a life insurance/annuity agent" in order to complete the state license application. Plaintiff argues that she was unable to make such an affirmation, because she was not currently using her LIA license as a CSR. In support of this assertion, Plaintiff attached a copy of an "Applicant Affirmation Statement" apparently provided by the Department of Financial Services. Dkt. #31, Page 30. Upon a review of the proffered Applicant Affirmation Statement, the Court concludes that Plaintiff's argument is without merit. There is nothing in the Applicant Affirmation Statement that would require a potential applicant to swear and affirm that they have prior experience as a life insurance/annuity agent.[5]

From a review of the record, the Court concludes that no genuine issue of material facts exists as to whether Plaintiff suffered from discriminatory or retaliatory conduct on the part of Defendant based on her race. As a result, Plaintiff has failed to show evidence supporting three out of the four necessary prongs required by law in order to establish a prima facie case of race discrimination.[6] Accordingly, summary judgment should be entered

---

[5] Furthermore, Plaintiff's argument is nonsensical. If Plaintiff's argument was correct, there would never be a "new" insurance agent, because a new insurance agent could never swear and affirm to possess prior experience as a life insurance/annuity agent.

[6] Since Plaintiff has not met her burden of persuasion, it is not necessary for the Court to address the issue of whether Defendant has articulated a legitimate, non-discriminatory business reason for the employment action at issue, or whether such reason is pretextual.

in favor of Defendant, Huntington National Bank, as to Plaintiff's claims of race discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a) et seq., as amended.

**V.      Plaintiff's claims under 42 U.S.C. § 1981, et seq.; and the Florida Civil Rights Act, Florida Statutes Chapter 760 must also fail.**

Since Plaintiff has been unable to establish a prima facie case of discrimination under Title VII, the Court concludes that Plaintiff's claims under Section 1981 and the Florida Human Rights Act must also fail.  The requirements for proving claims of discrimination and retaliation under Section 1981 are the same as those applicable to Title VII.  See Patterson v. McClean Credit Union, 491 U.S. 164, 186 (1989); see also Cooley v. Great Southern Wood Preserving, 138 Fed. Appx. 149, 160 (11th Cir. 2005).  Likewise, federal Title VII case law is applicable to cases brought under the Florida Human Rights Act.  See Burger v. City of Daytona Beach, 1996 WL 673144, *10 (M.D. Fal. 1996), citing Brand v. Florida Power Corp., 633 So. 2d 504, 507 (Fla. 1st DCA 1994).  Accordingly, summary judgment should be entered in favor of Defendant, Huntington National Bank, as to Plaintiff's claims of race discrimination in violation of 42 U.S.C. § 1981, et seq.; and the Florida Civil Rights Act, Florida Statutes Chapter 760.

It is therefore ORDERED AND ADJUDGED that:

1.      Defendant's Motion for Summary Judgment and Supporting Memorandum (Dkt. #29) is GRANTED.

2.      The Clerk is directed to enter JUDGMENT in favor of Defendant, Huntington Bancshares, Inc. d/b/a The Huntington National Bank, and against Plaintiff, Diane Williams.

3.     The Clerk is directed to CLOSE this file and terminate all pending motions.

**DONE** and **ORDERED** in Tampa, Florida on May 22, 2006.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies furnished to:**</u>
Counsel/Parties of Record

S:\Even\2004\04-cv-2298.msj.wpd